# EXHIBIT 7

CRIMINAL

No. 15628 Ex. Sec. ________

# DISTRICT COURT

St. Louis County, Minnesota

STATE OF MINNESOTA

Plaintiff

vs.

LAURA WILLAIMS
aka ~~LAURA MARKS~~ aka MRS. LAMONT
aka MARY LINDA LAMONT aka ANN MARLOW
aka ANN DAVIS
Defendant
aka LAURA MILLER aka GIFTED ANN

CT I: CT II: CT III: CT IV: CT V: CT VI:
CT VII: CT VIII: THEFT BY SWINDLE

Alan Mitchell - County Attorney
Plaintiff's Attorney

________
Defendant's Attorney

Date of Entry November 30 19 82

State of Minnesota County of ST. LOUIS COUNTY Court

| CCT | SECTION/Subdivision | U.O.C. | GOC |
|---|---|---|---|
| 01 | 609.52 Subd. 2 (4) | 2602 | N |
| 02 | 609.52 Subd. 2 (4) | 2602 | N |
| 03 | 609.52 Subd. 2 (4) | 2602 | N |
| 04 | 609.52 Subd. 2 (4) | 2602 | N |
| 05 | 609.52 Subd. 2 (4) | 2602 | N |
| 06 | 609.52 Subd. 2 (4) | 2602 | N |

| CTY. ATTY. FILE # | CONTROL AGENCY | CONTROL # |
|---|---|---|
| 82PD743 | MN0690600 | See Below |

COURT FILE # 80511 DATE RECEIVED 11-30-82

Complaint 15628

[X] (more than 6 counts (see attached)

I-82032717
II-82023218
III-82033613
IV-82033437
V-82033438
VI-82033488
VII-82033557
VIII-82033556
XR-82028268

☐ SUMMONS
[X] WARRANT
☐ ORDER OF DETENTION

[X] FELONY
☐ GROSS MISDEMEANOR

State of Minnesota PLAINTIFF,

VS.

NAME: first, middle, last

LAURA WILLIAMS a/k/a Laura Marks; a/k/a Mrs. Lamont; a/k/a Mary Linda Lamont; a/k/a Ann Marlow; a/k/a Ann Davis; a/k/a Laura Miller; a/k/a Gifted Ann, DEFENDANT.

Date of Birth: 030751

COUNTY ATTORNEY SJIS COMPLAINT NUMBER: [illegible]

**COMPLAINT**

***The Complainant, being duly sworn, makes complaint to the above-named Court and states that there is probable cause to believe that the Defendant committed the following offense (s). The complainant states that the following facts establish PROBABLE CAUSE:***

That your complainant is an Officer with the Duluth Police Department. That he is familiar with persons submitting reports to him in this matter and he believes those persons to be reliable and their reports to be true and correct.

On November 2, 1982, at approximately 11:15 p.m., Frances Johnson came to the Duluth Police Department to file a complaint reference a loss of a large quantity of money incurred by her. Johnson related to Officers Lyons and Roberg that since approximately August 14, 1982, she had been visiting on a regular basis a lady known to her as Mrs. Mary Lamont. Lamont operates an astrology/psychic/palm reading business from a home at 316 West Central Entrance, Duluth.

When Johnson came to Duluth Police Headquarters, she had with her a variety of items that had been used by Lamont in the fraud that she performed on Johnson. These items include a white envelope containing small amounts of what was believed to be incense, a holy bible, a yellow holy candle with a gold symbol on it, two spools of orange thread, a small piece of torn hankie containing a small amount of same material as the incense and some other writings. Frances Johnson also brought with her copies of bank deposits, withdrawals, and passbooks showing the flow of money from Johnson's personal accounts. She also provided us with an itemized long distance phone bill for the months of September and October, 1982, from her phone number in Grand Marais.

After initially speaking with Johnson for a time, Officer Lyons asked her to relate to the best of her knowledge all of the meetings with Mrs. Lamont, beginning with her first meet on August 14, 1982. She told the following.

On or about August 14, 1982, Frances Johnson and a friend of hers, Barbara Pelto, formerly of Grand Marais now residing in Texas, had an appointment at Mrs. Lamont's at 316 West Central Entrance. It was during the day and Johnson and Pelto went together. Their interviews with Lamont were separate, and required them to choose between tea leaves, tarot cards, or astrology readings. Johnson said she went first and chose tea leaves and was read these leaves by Lamont. Lamont told her she had sadness, would live to be 89-years-old, she would get two letters, would go on two trips, and discussed the man in her life. Johnson said then she related to Lamont that she had had a recent divorce and was quite despondent about this. The conversation centered around this and Lamont finally told her there was darkness and evil around her and the evil was because of what the marriage did. Lamont then told Johnson she should come back to her and that no one must know that she was coming back. She said her and Pelto left and she never informed Pelto that she would come back for a second visit.

FILED IN MY OFFICE AT ____ O'CLOCK ____ M
NOV 30 1982
Clerk of ... Court
JOSEPH M. LASKY
[signature] Deputy

**COMPLAINT/INDICTMENT SUPPLEMENT** 80511

| CCT | SECTION/Subdivision | U.O.C | GOC |
|---|---|---|---|
| 07 | 609.52 Subd. 2 (4) | 2602 | N |
| 08 | 609.52 Subd. 2 (4) | 2602 | N |

PAGE 2 of 18

SJIS COMPLAINT NUMBER(S):

69-11-3-005005

Approximately four days later on August 18, 1982, she returned to Lamont's Astrology House. Lamont told her she could rid her of evil, she told her to bring a fresh egg, wrap it in a hankie, and tie it with bright colored thread. She was told to put this egg in her shoe under her bed and pray.

On or about August 19, 1982, Lamont came to Johnson's residence in Grand Marais. She was driven to the residence in Grand Marais by the person Johnson knows as Lamont's husband, John, in a gray and maroon Chevrolet Suburban. She said that John Lamont had some business at Lutsen, as he was selling trees there. Johnson also told us at this time that Lamont told her her husband John, was in the wholesale jewelry business and worked out of his home. On this third visit at Johnson's home, the center of the meet was the egg. Lamont rubbed the egg all over herself and then had Johnson smash the egg with her fist. Lamont then unraveled the egg inside the hankie and took a pin out of her hair and moved it through the egg. She then told her that there was a piece of hair in the egg and produced a piece of a lock of hair, and said this was evil. She then said that there were three people who had put evil on her and that these three people totaled nine spirits, four were with Lamont and five are with the devil. Lamont then asked Johnson how much she had in savings and asked her how she did in her divorce settlement. She told her that evil had been done through money and she would have to get $300 in tens and twenties out of her savings and wrap this in her hankie and wear it close to her. She also told her this had to be in confidence and no one else must know about it. She gave Johnson the candle and told her to burn the candle when she had any doubts of Lamont's powers.

The next visit by Johnson to Lamont's home was around August 23, 1982. She told her that she was working hard for her and that she would have to go get a tomato and come back. Lamont and Johnson left Lamont's house and went to some store in the Central Hillside where they got a tomato. They then came back to the house. At this time, Lamont told Johnson that the $300 she had close to her in her bra was not good enough, and that she would need more money. She told her to withdraw $7,000 from her savings at First Federal Savings & Loan and wear it close to her. This Johnson did, wearing $7,300 next to her. This $7,000 withdrawal is noted on August 23, 1982, from Frances Johnson's account #7017011072 savings account at First Federal Savings & Loan, Duluth. Lamont then instructed Johnson to come back around August 27, 1982.

On August 27, 1982, Johnson came to Duluth and stayed at the Prime Rate Motel in the Miller Hill Mall. She had brought with her the tomato from the earlier meeting with Lamont. The tomato was broken and inside the tomato was a "black head with two white eyes". Lamont told her that she could see the evil devil looking at her. She then told Johnson that three people had bought evil from a person for $28,000. She told Johnson that Johnson would have to match this amount to fight the evil of these three people who were against her. During this day, August 27, 1982, Johnson went to First Federal Savings & Loan and cashed in a savings certificate totaling $9,523.97. She then withdrew from her savings account at First Federal $19,909.26. She was instructed to not take this $19,909.26 out of the bank in one check, but take it out in two separate checks issued from First Federal Savings. These checks were numbered 01006909 and 01006908. After withdrawing these amounts of from First Federal, she was instructed by Lamont to take all of the money and divide it three ways. Then she was to take the one-third total amount and deposit one half of that in three separate banks. Documentation indicates that on August 27, 1982, Johnson went to Northwestern Bank of Commerce in Duluth and opened an account #94335. She presented a check for a total of $9,954.63, and deposited from that check $4,977.31, she received a cash back of $4,977.32. The same day she went to First National Bank of Duluth and opened an account #2410561, depositing into that account $4,977.32 and taking out in cash $4,977.31. She then went to her bank where she has her checking account, that being First Bank-Duluth, and with the remaining money she had she took one half of that, being $4761.99, and deposited that into her checking account at First Bank. She kept from that sum of money $4,761.98. Johnson was then instructed to from each of these banks take an envelope and put in the amount of cash she kept from each bank. From First Bank she kept $4,761.98 and put that into an envelope. From Northwestern Bank of Commerce she kept $4,977.32 and put that into an envelope. From First National she kept $4,977.31 and put that into an envelope. She was instructed prior to this that all this money must be in $100 bills.

**COMPLAINT/INDICTMENT SUPPLEMENT**

80511

| CCT | SECTION/Subdivision | U.O.C | GOC |
|---|---|---|---|
| | ADMINISTRATIVE INFORMATION | | |

PAGE 3 of 18

SJIS COMPLAINT NUMBER(S):

69-11-3-005005

During this same day, August 27, 1982, Johnson again met with Lamont and had with her at this time a strong box which Lamont had told her previously in the day to acquire. Into the strong box she put these three envelopes with the money, still keeping the $7,300 next to her breast in a wrapped up hankie. Lamont then burnt a $100 bill which she had taken from the $7,300 in Johnson's bra. She wrapped the ashes from this $100 bill in a white piece of cloth and tied it with string and told Johnson to wear this next to her breast, and when she awoke the next morning at the Prime Rate Motel to unwrap it and see if Lamont's powers were good.

Johnson said when she came to Lamont's house on August 27, 1982, with the quantity of money, Lamont counted the money on several occasions and appeared to get mixed up and kept recounting the money. Johnson said she never had counted the money from when it left the bank in the envelopes. Johnson further stated that Lamont, at this particular time, produced what she said was $3,000 which Lamont said she had raised from her church. She said that she would put this money with the other money to show her honesty. She said she had borrowed this money from the church. Johnson said she was never sure where the money came from, nor if the money was ever included in the amounts in the strong box. Johnson left and stayed the night at the Prime Rate Motel on August 27, 1982 with the strong box and money in her bra.

The next morning she awoke on August 28, 1982, and was instructed to face the sun and chant a prayer. She did this and was then instructed to open the piece of cloth wrapped in string which had contained the ashes from the previous day from the $100 bill. She did this and found inside the cloth again a whole $100 bill plus a $50 bill. She talked to Lamont on this day and Lamont told her this showed her a sign of faith and that her powers were working. She was instructed to go home and take an egg and wrap it in a hankie and place it under her bed again. Johnson then went home to Grand Marais with the three envelopes of money in the strong box and the $7,350 in her bra.

On September 1, 1982, she came back and visited Lamont on a Wednesday evening. Lamont broke the egg and inside the egg was a "serpent or silver snake with teeth". Johnson recalls now that this appeared to be similar to a plastic or rubber snake that you can buy at a dime store. On the evening of September 1, 1982 she and Lamont went to Lakeview Castle for dinner and on this evening while coming back from the Lakeview Castle Lamont was driving very fast. Lamont was driving Johnson's car. She was stopped coming into Duluth by two Duluth Police Officers and was issued a speeding ticket on this date. This is reflected in the court documents where Sergeants Dale Erickson and Tom Ehle issued a speeding ticket to Mary Linda Lamont on September 1, 1982, Wednesday. Johnson was then instructed to go to her room at the Prime Rate Motel with the strong box.

On September 2, 1982, Johnson was instructed by Lamont to withdraw from Northwestern Bank of Commerce and from First National Bank $2,500 per bank. Lamont told Johnson she needed this money to raise the power and that she would have to do this to make her powers stronger. Johnson recalls at this time drinking coffee at Lamont's home and recalls Lamont telling her she had to drink all of the coffee. She remembers that she became very light headed after drinking coffee on this occasion and on several other occasions was offered the same cup of coffee by Lamont and instructed her to drink it all.

She then withdrew the $2,500 from each bank, and with this came back to Lamont's house. Lamont counted all the money and kept getting confused in her counting. After Lamont counted again on this date, she the put whatever money was in the box back in the box along with the $5,000 she had withdrawn. She instructed Johnson to keep the $7,050 in her bra, as the $300 had been burned previous in the day.

On September 3, 1982, Johnson awoke at her room at the Prime Rate Motel and again found the ashes of the $300 was now intact and she had again $7,350 in her bra. After an appointment at the Hair Port in the Miller Hill Mall, she left Duluth with the strong box containing what she believed was around $20,000.

**COMPLAINT/INDICTMENT SUPPLEMENT** **80511**

| CCT | SECTION/Subdivision | U.O.C. | GOC |
|---|---|---|---|
| | | | |



SJIS COMPLAINT NUMBER(S):

69-11-3-005005

From September 3, 1982, Johnson had serveral phone calls placed from her residence to the Lamont residence, Lamont twice on September 6, 1982 one on September 7, 1982. During one of these phone calls Lamont instructed Johnson that she would have to find a live chicken and bring it to Lamont's home on the next visit.

On September 11, 1982, Johnson recalls going to a wedding in the afternoon, which was a Saturday. She then recalls going out and buying a live chicken at the Hendrickson's residence in Grand Marais. She then called Lamont at Lamont's Virginia, Minnesota office she believes around 6:30 p.m. The long distance phone charges indicate a call to a Virginia number, 741-9657 on September 11, 1982 at 6:38 p.m. Johnson was instructed at this time to come to Duluth on September 12, 1982.

On September 12, 1982, Johnson came to Duluth and stayed once again at the Prime Rate Motel. This was a Sunday afternoon and she stopped at Lamont's house and Lamont asked her how she was feeling and what she was dreaming. They then went shopping at the M & K store in the Thunderbird Mall in Superior and ate at the Library Restaurant in Superior with Lamont and her two daughters, Lisa and Sylvia. Lamont wanted to go see the movie Poltergeist(ph) as it was about evil. Johnson did not want to go alone and they ended up going back to Lamont's house at 316 West Central Entrance where they watched a movie, Mommie Dearest. It was at this time that Johnson told Lamont the chicken was still in the trunk of her car and she believed it would die if they did not feed it. They brought the chicken into the house and fed it bread and water. Lamont then instructed Johnson to take the chicken to her room at the Prime Rate Motel and return the next morning.

On Monday, September 13, 1982, Johnson woke up and went to Country Kitchen and had a cup of coffee and juice. She then came to the Lamont house and Lamont once again gave her coffee, a doughnut, and a cookie. She said she drank the coffee and she and Lamont sat on the porch for a while. They then went into a closed off room on the front porch and Lamont instructed Johnson to go out to her car and get the chicken and the strong box with the money still in it. Johnson came back in and was told by Lamont that they would have to kill the chicken to take away the pain and the suffering. The chicken was in a box and Lamont took some newspaper and put it on the lap of Johnson. They then did a chant together and Lamont then held the chicken under the wings. Lamont told Johnson to grab the mouth of the chicken and she had to repeat a chant and then spit three times in the chicken's mouth. Johnson said that the chicken then died and was laying there limp. Lamont then told Johnson that the chicken would have to be buried in a cemetery in Grand Marais at 4 a.m. in the morning. She also told Johnson that the nine spirits that were against her, Johnson, would be asking her questions while she was burying this chicken. Johnson told Lamont she could not do this and Lamont said she would do it for her. Lamont then took the strong box an put it on Johnson's lap. Johnson has never counted money since the time she took it out of the bank. Johnson then had to rip long strips of newspaper, supplied to her by Lamont. Lamont had this big silver pot on the floor and it appeared to be scorched inside. Lamont then took the money and started counting it. She once again became confused and mixed up. The money that Lamont was counting included all the money in the box, including approximately $20,000 of Johnson's savings as well as the $7,350 which she had taken from her bra. Lamont also said that the $3,000 of her church money was there too. Lamont then folded the money and wrapped it inside a large piece of white cloth similar to a bed sheet. She tied it in two separate directions with string and placed this in a big silver pot on the floor. Johnson was then instructed to take he ripped pieces of newspaper and lay them on top of the money. During this time she had a second cup of coffee and indicated she was becoming very light headed. They then chanted for a while and lit the strips of newspaper on fire in the pot. She said that the room became quite smoky and after a short period or time, the fire burned itself out. Lamont then took the ashes that were left in the bottom of this pot and wrapped them inside a white piece of cloth and tied this. Lamont told Johnson that Lamont would have to take the ashes and the dead chicken and bury them together at the cemetery.

On September 14, 1982, Lamont called her and said she had a client in Silver Bay and would be stopping in to see Johnson.

COMPLAINT/INDICTMENT SUPPLEMENT

80511

| CCT | SECTION/Subdivision | U.O.C. | GOC |
|---|---|---|---|
| | | | |

PAGE 5 of 18

SJIS COMPLAINT NUMBER(S):

69-11-3-005005

On September 15, 1982, Lamont came to the home of Johnson in Grand Marais accompanied by her husband, John Lamont. Mary Lamont and Johnson then went to the Common Ground Restaurant and had dinner in Grand Marais. When they came back from the restaurant John Lamont was waiting. Lamont told Johnson at this time that the chicken had come alive and that she had to kill it again as the spirits were really strong. She told her to continue burning the candle if she had any doubts and that it would take time.

On September 16, 1982, Johnson and a friend went to Duluth. Johnson went to see Lamont at her house. She once again had coffee and a cookie and Lamont reaffirmed that she was working hard for Johnson. There was a chant and she then left.

On September 19, 1982, Johnson was instructed to call Lamont in Virginia and did so. This is reflected on her phone bill of September 17, 1982.

She once again called Lamont on September 18, 1982 and Lamont reaffirmed her work for Johnson.

On September 21, 1982, Lamont again came to Grand Marais. She brought with her a bible and told Johnson it would make her a better Christian. Lamont did not stay long and left.

Johnson then cannot recall meeting with Lamont until September 29, 1982 when they met in Duluth. They shopped at Tivoli's in the Miller Hill Mall and Johnson purchased an item with a check. She was instructed by Lamont to go se the movie Amnyteville(ph) II, which dealt with psychic phenomena. She never did go to the movie. Mary reconfirmed everything with her but Johnson was becoming suspicious and told her she wanted her money back. She told her she could not cope with the loss of all her money. Lamont told Frances Johnson that she could bring the money back but if she does that the evil power would be too great for Johnson to handle. The contacts with Lamont then became very sporadic and her last contact with Lamont was on October 11, 1982, when Johnson came to Duluth. She refused to stay overnight at the Prime Rate Motel anymore or anywhere in Duluth, but met with Lamont and they went shopping in the Miller Hill Mall Glass Block and Johnson had supper at Lamont's house. Lamont then told Johnson she would have to confirm her doubts and fears of Lamont's powers. She told Johnson to burn the candle and gave her some incense.

On October 13, 1982, Lamont and Johnson contacted each other, and Lamont said she had to leave for Canada to go to a prayer meeting. This meeting would be at a church on a hill in Canada. Lamont was to leave only with her boy who had an ear infection.

On October 19, 1982, Lamont called Johnson from supposedly in Canada and told her to take her mom out of the nursing home in Wisconsin.

On October 24, 1982, she received a phone call from Canada again and told Johnson to keep the faith.

On October 26, 1982, Mary Lamont called Johnson again from a long distance phone. She said she would be back on October 27, 1982 and to keep the faith.

The following is a list of monies which Johnson has lost:

| | | |
|---|---|---|
| 08-29-82 | $ 300.00 | From Johnson's checking account at First Bank. |
| 08-23-82 | $7,000.00 | From Johnson's checking account at First Federal. |
| 08-27-82 | $4,877.32 | From the newly opened account at First National. |
| 08-27-82 | $4,977.31 | From the newly opened account at Northwestern Bank of Commerce |
| 08-27-82 | $4,761.98 | From the recently added checking account at First Bank-Duluth |
| 09-02-82 | $2,500.00 | From the First National Bank, Duluth. |
| 09-02-82 | $2,500.00 | From the Northwestern Bank of Commerce, Duluth. |

FORM I-1

## COMPLAINT/INDICTMENT SUPPLEMENT

**80511**

| CCT | SECTION/Subdivision | U.O.C. | GOC |
|---|---|---|---|
| | | | |



**SJIS COMPLAINT NUMBER(S):**

69-11-3-005005

Johnson gave us the following information on Lamont and her family:

Mrs. Lamont has a daughter named Sylvia who she believes around 19-years-old and does do fortune telling at the house also. She believes Sylvia is out of school. Sylvia answers the phone and sets up most of the appointments. Lamont has a daughter she believes is 14-years-old, named Lisa, who is in high school or at least high school age. Lamont has a son, Erick, who is 7-years-old and has an ear problem, and a son, Eddy, who is 10-years-old. Lamont's husband's name is supposedly John Lamont, and he is suppose to work as a tree seller at Lutsen and also as a wholesale jeweler. They have three vehicles, a black car, a bronze car, and a silver maroon Chevrolet Suburban, which they use often. She knows of two telephones in the house and one in the Range. The Virgina number is 741-9657, the Duluth number is 727-9653, and the other phone, supposedly connected to the house, is 727-7335, which is supposedly John Lamont's wholesale jeweler number.

The business and administration offices of Northwestern Bell at 322 West First Street in Duluth, Minnesota, have on file the credit and toll call records for numbers 741-9657, 727-9653, and 727-7335 in area code 218. Records are available for a six month period.

During a number of the visits described above, Johnson felt "light headed" after drinking "coffee" provided to her by Mrs. Lamont. Your affiant wants to seize any coffee or coffee-like substance to have it analyzed to determine if it contains any drug substance which could alter a person's mental state.

Mary Linda Lamont is believed to have another name or group of names.

Frances Johnson was shown a series of photographs of several persons who the Duluth Police Department believes could be Mrs. Lamont. She looked at a Colorado Springs Police Department photo dated April 15, 1976, #39763. She looked at it and immediately said, "This is the lady". This lady was arrested by the Colorado Springs Police Department in 1976 under the name of Ann Marlow; also known as Laura Williams; also known as "Gifted Ann"; also known as "Mother Gaylord"; who had an address of 1619 North Circle Drive, Colorado Springs, Colorado. She was then described as a white female, 502, 115 pounds, date of birth 03-12-52, place of birth Houston, social security #[redacted], FBI #730614P4, Colorado I.D. [redacted]. She was arrested on an alleged gypsy fortune-telling scam after taking $38,000 from two elderly females.

During 1981 and 1982, the Duluth Police Department had received information that "Mrs. Lamont" was obtaining large amounts of money from people in return for psychic powers and suggestions. Some citizens had reported the loss of their money to the police but were reluctant to pursue the matter further. Because of these reports, the police made arrangements for one Virginia Price to visit Mrs. Lamont. Mrs. Price was equipped with a body microphone which enabled most of her contacts with Mrs. Lamont to be recorded.

The visits commenced September 20, 1982 at Mrs. Lamont's place of business and residence at 316 West Central Entrance in Duluth.

On September 20, 1982, Price arrived at the Lamont residence and place of business at 11 a.m. She was met in the outer lobby by female who represented herself to be a type of receptionist at the home and identified herself as Mrs. Lamont's daughter. Mrs. Lamont then came into the room and after a short period of time, it was decided that Price would use the tarot cards to help Lamont determine her future. After a brief discussion of her future, Mrs. Lamont instructed Price to take thread and tie nine wooden matches together around her bed. After doing this, she was then instructed to bring the items back with her at her next appointment the following day. The following day, Price again went to Lamont's business. She brought with her the nine wooden matches which were bound with a maroon color thread. Also as instructed, she had wrapped a dollar bill around the outside of the bundle. However, she was informed that Lamont did not have time to see her and she would have to make another appointment. As Price left the home, she observed in the back of the residence, a 1972 Ford automobile bearing Oklahoma license #OW5930. This license lists to one Miller Williams, according to Motor Vehicle Registration.

COMPLAINT/INDICTMENT SUPPLEMENT

80511

| CCT | SECTION/Subdivision | U.O.C. | GOC |
|---|---|---|---|
| | | | |



SJIS COMPLAINT NUMBER(S):

69-11-3-005005

On September 28, 1982, Price returned to the residence whereupon Lamont performed a type of ritual with the string and the matches which Price had brought with her. During the interview, Lamont asked Price how much money she had including all of her stocks and bonds and other savings. Lamont then instructed Price to take an egg, wrap it in three bills, and wrap inside a handkerchief and sleep with it under her bed. She was instructed to bring the egg back the following day. During this interview, Lamont emphasized that she was working and that God was working through her. She recited a quite lengthy chant asking God to drive away the devil and lead her onto peace and contentment.

On September 29, 1982, Price returned to Lamont's. She brought an egg which she had supplied from her home and had it wrapped according to Lamont's instructions. Lamont' opened up the handkerchief and looked at the egg and then left the porch area where she had been conducting her meetings. She then returned with the egg, rewrapped it in the money and the handkerchief and told Price that she would have to sleep on it another day. Price then left the astrology parlor. Back at the police department, Officer Lyons and Roberg, met with Price and examined the wrapped egg. While looking at the white handkerchief that the egg was wrapped in, officers noticed that the knot on the handkerchief appeared to be very peculiar and it would not permit them to untie it without fear that whoever tied the knot, would be able to tell that the knot had been untied.

On September 30, 1982, Price returned to Lamont's with the egg. After the introductions, Lamont began her meeting with Price. She emphasized to Price that "This is the first time I see the egg, the first time I touch it. Is that right?" Lamont then commenced a lengthy chant asking for God to help them. She then mentioned to Price how she had a vision regarding hair and "bad signs". Lamont then appeared to break the egg, whereupon as she removed a tangled up wad of hair. According to Lamont, this was proof that God was going to help her. A portion of the transcript reads as follows:

> "Now, see dear, this is just a proof of God that I'm going to help you. The two main evils, the two main bad lucks are still left on your body, it's trying to suffer you, it's trying to pull you down, so you not gonna succeed, so you not gonna gain. Do you understand, but you got to do something like I'm gonna tell you, now wring your hands. Now I told you dear when people they done this bad luck to you they never been done it with what you eat, they never been done it with what you drink or what you wear, because what you eat, drink, and wear is all through God, but I told you the only way they can find out to go to you is with money. Because why, money is evil, money is devil. I told you people they kill for money, people rob for money, people do all sorts of evil things with money. You understand? ...and we got to kill the evil with the evil."

Lamont then instructed Price to take the nine largest bills that she had and wrap them in a hankie and place it next to her body inside her bra. She further told her to place it underneath the mattress on her side of the bed when she went to sleep that night.

On October 1, 1982, Price again met at Lamont's. After again following Lamont in a lengthy chant asking for the intervention of God, Lamont then burned a ten dollar bill to demonstrate how evil must be destroyed. Lamont then placed what she told Price where the ashes of the ten dollar bill in a white handkerchief and told her to take that and again place it next to her body for the evening. Back at police headquarters, after the interview, Price produced the white handkerchief where it was open by Officer Roberg and Lyons. They opened the handkerchief and inside found one of the ten dollar bills that they had provided to Price before she had gone into the house. It was not burnt in anyway. According to Lamont, if the bill had been restored, it would be a demonstration that she did have power to help Price get rid of the evil in her life.

COMPLAINT/INDICTMENT SUPPLEMENT

80511

| CCT | SECTION/Subdivision | U.O.C. | GOC |
|---|---|---|---|
| | | | |

PAGE 8 of 18

SJIS COMPLAINT NUMBER(S):

69-11-3-005005

On October 2, 1982, Price called Lamont as instructed and told her that she had opened up the packet and the ashes were gone and in its place was a ten dollar bill. Lamont told Price to place the packet next to her bosom and sleep with it for the next day. Price telephone Lamont on October 4 whereupon Lamont told her to bring the packet of money back on October 5 along with a tomato.

On October 5, 1982, Price returned to Lamont's. She brought with her the packet of money and a tomato. After a lengthy ritual and continued chanting, Lamont had her step on the tomato. Lamont then appeared to produce from inside the tomato, a rubber worm/snake-like object which Lamont told her was a snake. Lamont told Price that this was a sign that she did have power to help her in drawing the evil out of her body. Lamont then instructed Price to get a larger amount of money telling her she would need $2,000 to keep "close to her". When Price hedged on the amount of money, Lamont sternly told her, "Don't say if you can get it. I know you can do it." Lamont then instructed Price in how to fold the $2,000 and she was to be at Lamont's the following day. Price was then given a ride by Lamont to downtown Duluth in Lamont's vehicle, a brown 1976 Ford two-door, Minnesota license #LZM482, which lists to one John Lamont of 316 West Central Entrance.

On October 6, 1982, Price went to the Lamont residence and told her that she only could put together $1,300. She was told by Lamont that there was not time to see her today, but to take another egg and wrap it in a hankie and place it under her bed again that night.

On October 12, 1982, Price returned to Lamont's. Lamont informed Price that there was something dark around her. She instructed Price to take the egg and rub the egg around her on her body and again sleep with it under her bed. Price still had the $1,300 which had been provided to her by the Duluth Police Department.

On October 13, 1982, Price met with Lamont again. Lamont took the money out of Price's bra and examined it. She then left the room and returned with what she said was $700, 7 one-hundred dollar bills, which she put in with the $1,300. She stated that this will now total $2,000 and she would be able to help price even more. She told Price that the $700 came from "her church".

Lamont then discussed the egg that Price had brought with her. She told Price that if the egg was clear once it was broken, there was nothing that Lamont could do for her because her powers were not strong enough. However, she told Price that if there was any sign in the egg, she would know that she could help Price with her powers. Lamont then shook the egg a couple times, covered it with a handkerchief and then had Price break the egg. As this was being done, Lamont told Price that "If the devil shows up, then your money has to suffer for a while." Lamont emphasized that the money has to draw suffering away from her. Lamont then appeared to produce from the egg, a small walnut-like object, red in color, which appeared to be a face. Lamont cried out to God when she saw the object and asked Price, "Do you want to evil like that". She pointed out to Price the mouth, the eyes and the nose. Lamont then took the $1,300 and told Price that they had to work to clear the evil away from her. Price asked Lamont if she would get her money back. Lamont told her that she would when, "the work was finished". Lamont told Price that there was still some darkness around her and therefore, the "money must lay dead". She emphasized to Price that she needed her utmost trust and she obtained Price's phone number for the next contact.

On October 14, 1982, Price returned and Lamont told her that she had a trip to go on out of town for a "church meeting". She instructed Price to call her the following day.

During the following two weeks, Price had only phone contact with Lamont. During the time also, Lamont told Price that she was going out of town and that she would praying for her and for the money.

Throughout Mrs. Price's visits, she left a total of three handkerchiefs with Lamont. They are described as: (1) faded red with blue edge; (2) off-white linen fabric, and (3) blue floral pattern with red and white.

FORM I-1

**COMPLAINT/INDICTMENT SUPPLEMENT**

C0511

80511

PAGE 9 of 18

SJIS COMPLAINT NUMBER(S):

69-11-3-005005

| CCT | SECTION/Subdivision | U.O.C. | GOC |
|---|---|---|---|
| | | | |

The serial numbers for the currency given to Lamont by Price are: One hundred dollar bills B25952944A; I01224852A; G38542957A; and K06210090A. Fifty dollar bills G00085102A; G12404566A; G13195223A; G00644420; G17762796A; I00370412A; H04478368A; E18645651A; D12656721A; D01158090A; B26388056A; L07867403A; and E00425748. Twenty dollar bills G39233383B; G36278475A; B19458635B; I66630927A; G78472428A; and J58690837A.

Information received by the Duluth Police Department has led the police to believe that Mary and John Lamont are concealing their true identity. Mrs. Lamont has been operating her business for a period of approximately two years and the Central Entrance location. The Duluth Police Department learned that on or about June 10, 1980, two persons, one identifying himself as James Marks, of 7925 State Avenue, Kansas City, attempted to open an astrology and palm reading business at a vacant building at 5573 Arrowhead Road in Hermantown. According to information obtained through Walton Realty, James Marks also represented himself to be James Davis and told a realtor that he was in the process of changing his name because he had been kidnapped due to his father having alot of money.

Additional investigation regarding the Marks family has revealed that a James Marks and a Linda Marks were arrested in July of 1980 by the Colorado Springs Police Department and the Elpaso County Sheriff's Office. The charges involved indictments ranging from Theft to Cruelty to Animals. The Marks allegedly told their clients that they could relieve the guilt feelings by giving their money that was "cursed". The Cruelty to Animals charge stemmed from an alleged killing of a chicken by one Linda Marks during a spiritual rite. The investigation conducted by the Colorado Springs Police Department reveals that there were similarities to the activities that take place at Mrs. Lamont's business today. This similarities included the burning of money, the wads of hair inside eggs, and the lizards or snakes inside tomatoes.

Police surveillance of 316 West Central Entrance has revealed the following. One automobile, a 1976 Ford, brown, four door, license #LZN482 lists to John Lamont. Minnesota license records indicate that John Lamont's date of birth is 02-05-49. However, the Department of Motor Vehicles in Minnesota shows John Lamont as the listed driver. A check with several other states indicates that a John Lamont with the same date of birth, has a driver's license in the State of Kansas with the address of 5701 South Topeka. According to Kansas bureau investigators, 5701 South Topeka is the address of a restaurant, not of a residence.

On September 1, 1982, Officers Erickson and Ehle of the Duluth Police Department stopped a Buick Minnesota license #DLT685. (See above reference) The driver was identified as Mary Linda Lamont, who provided her address as 316 West Central Entrance, date of birth 03-07-51. Mary Lamont produced a Kansas driver's license the license provided the address of 5701 South Topeka, the same address provided by John Lamont which lists to a restaurant and is not a residence.

The 1978 Chevrolet Suburban, maroon and silver, bears Kansas license #WY025377. Records indicate that this vehicle is registered to one William J. Miller, 1114 Minnesota Avenue, Kansas City, Kansas. This is the same address that James Marks used when he was arrested in Colorado Springs in 1980. He allegedly used the address of his parents who he gave at that time as Steven and Rachel Marks, 1114 Minnesota Avenue, Kansas City.

Another vehicle seen often at the residence during the past two months is a 1982 Camaro, silver/blue, bearing Iowa plates Z28H this lists to a James Marks also who provided whose date of birth according to records is 05-14-53, address 1400 Albia Road, Ottumwai, Iowa.

That on or about November 2, 1982, the Duluth Police Department received a report that a woman had been "bilked" out of a certain amount of money by a person identified as Mrs. Lamont. Your complainant believes this person to be Mary Linda Lamont, hereinafter referred to as the Defendant. The Defendant was operating a fortune and astrology business out of her residence at 316 West Central Entrance in the City of Duluth. Mrs. Lamont had been in operation at the Duluth address for approximately two years ending November of 1982.

**COMPLAINT/INDICTMENT SUPPLEMENT**

**80511**

| CCT | SECTION/Subdivision | U.O.C. | GOC |
|---|---|---|---|
| | | | |



**SJIS COMPLAINT NUMBER(S):**

69-11-3-005005

Investigation has revealed that the Defendant has used various aliases and has been identified as a person who has conducted similar gypsy-fortune telling operations in Colorado Springs, Colorado.

The woman who reported the loss of the money was identified as Helen O'Connell. Mrs. O'Connell is 75-years-old and is a resident of Silver Bay, Minnesota. She reported that at present, she had lost approximately $96,000 to Mrs. Lamont during her meetings with her over the past two years.

An interview was conducted of Mrs. O'Connell by Sergeant Ecklund of the Duluth Police Department. Mrs. O'Connell related that her first contact with the Defendant was in approximately November of 1980. This was about six months after the death of her husband. She had been despondent over her husband's death and had been referred to the Defendant by another friend. During the first meeting with the Defendant in Duluth, the initial charge was $15. The Defendant read tarot cards to Mrs. O'Connell. She told Mrs. O'Connell that she saw evil surrounding her and it involved three people in her life. The Defendant told Mrs. O'Connell she could help her with her problems. Since the first meeting, the Defendant and Mrs. O'Connell met frequently. They developed a relationship over the next year of trust on the part of Mrs. O'Connell that the Defendant was helping her in her life. The Defendant would provide her occasionally with sma'l gifts. The Defendant, accompanied by her alleged husband, John, and alleged children, would visit Mrs. O'Connell at her Beaver Bay home for picnics. The Defendant repeatedly cautioned, and warned that Mrs. O'Connell must not tell anyone that she was seeing her about any of the activity that carried on between them. Discussions eventually turned towards money. The Defendant told Mrs. O'Connell that the evil was surrounding her and the cause of the evil was her money. Again, Mrs. O'Connell was cautioned that she should not discuss anything that took place between the two of them because the spirits would be broken and disaster would come to her and her family.

During at least one of the meetings, Mrs. O'Connell was told to bring an egg with her that she had taken from her refrigerator. When she went to the Defendant's home, the Defendant tied it up in a handkerchief and then returned the egg to Mrs. O'Connell telling her to take it home and place it under her bed. Mrs. O'Connell then returned with the egg on another date. When the Defendant broke the egg, Mrs. O'Connell saw what was a small black snake inside the egg with its mouth open. The Defendant told Mrs. O'Connell that this was the evil that was surrounding her. It was a sign.

On another occasion, the Defendant told Mrs. O'Connell that she could see that she had stomache cancer but that she (the Defendant) could take it away. She was again told to bring another egg whereupon she did and then wrapped it as described above. When the egg was returned to the Defendant's, the Defendant broke it and from inside, appeared to produce a reddish substance consisting of what appeared to be veins and bloody material, which the Defendant said was her cancer and that Mrs. O'Connell no longer had it and was cured.

Eventually, during the course of the relationship in approximately October of 1981, the discussions turned more towards money. The Defendant would ask her about her financial status and tell her that she should bring her money to her so that she could bless and have her church bless the money and take away the evil surrounding it. Approximately during this time in 1981, Mrs. O'Connell withdrew $2,000 from a savings account in the First Northwestern State Bank of Silver Bay. As arranged, the Defendant, along with her husband, drove to Silver Bay to pick up the money. The Defendant then performed some rituals on the money. The Defendant took the money saying she was taking it to her church to be blessed.

In approximately October of 1981, Mrs. O'Connell's youngest son was discovered to have cancer involving brain tumors. When Mrs. O'Connell told the Defendant about this, the Defendant told her that he was sick because of the evil surrounding Mrs. O'Connell's money and that Mrs. O'Connell should bring in all of her money to be blessed. The Defendant indicated that Mrs. O'Connell's son would get better if she brought in all her money to be blessed. The Defendant told Mrs. O'Connell to cash in her savings certificate, one at a

**COMPLAINT/INDICTMENT SUPPLEMENT**

80511

| CCT | SECTION/Subdivision | U.O.C. | GOC |
|---|---|---|---|
| | | | |



SJIS COMPLAINT NUMBER(S):

69-11-3-005005

time, and to deposit the money in new savings accounts at other banks. The money was then withdrawn, a small amount at a time, until it was gathered together in a large amount and the Defendant would then bless the money and have her church bless the money also.

Mrs. O'Connell stated that she did as she was told to do by the Defendant. After opening new savings accounts and withdrawing the money at various times, she finally had withdrawn a total amount of $81,000. She placed the money in a locked metal box in her home. The Defendant stressed to her not to tell anyone about what she was doing because the spirit would be broken and her son would die. During early 1982, approximately January, Mrs. O'Connell met the Defendant in Duluth along with the $81,000 in the metal box. At the Lamont residence, the Defendant turned over the money to her. They donned white robes that the Defendant provided and went through a "purification ritual". The Defendant then represented to be tying the money into several packets and sewed them into some cloth. She then placed the packets in a large pot that was in the room and told Mrs. O'Connell that she had to burn the money in order for the spirits to receive it and for the money to be purified and blessed. The Defendant told Mrs. O'Connell that the money would be returned to her and even increase in amount after it was blessed by the spirits. Mrs. O'Connell believed the Defendant because of a previous incident where a $20 bill appeared in a hankie after appearing to be burnt by the Defendant.

The Defendant then had Mrs. O'Connell turn her back. The Defendant was kneeling on the floor where the money was and lit something on fire. Mrs. O'Connell believed it to the money because the room filled up with smoke. After the burning, the Defendant then said more prayers with Mrs. O'Connell and told her the spirits had her money and the money would be returned after the spirits removed the evil from it.

After this incident, Mrs. O'Connell's son's condition worsened. She told the Defendant about this and the Defendant told her to bring in more money. Mrs. O'Connell cashed in one of her remaining certificates in the amount of $30,000. Fifteen thousand dollars of the certificate was put in the savings account and arrangements were made for the Defendant to pick the money up. Mrs. O'Connell recalls the Defendant along with her husband John coming to her home to pick up the money. Rituals were performed over the money and the Lamonts took it telling that they would take it to the church for blessings.

Mrs. O'Connell stated to police that she trusted the Lamonts at all times. She believed she would get her money back after it was blessed. She was also afraid to tell anyone about what the Defendant was doing because the Defendant told her disaster would come to her; but for a $100 amount, she has never received any of her money back from the Defendant.

On October 9, 1982, a search warrant was executed at the 316 West Central Entrance residence. Inside this location, our officers of the Duluth Police Department found among other items, a jar which contained a number of preserved snakes, appearing to be baby snakes, small, black, with mouths open. Also, officers found a number of different identification items suggesting that the Defendant has used at least ten other names. Officers also found what appears to be burnt play money wrapped up in a handkerchief. They also found empty wrappers that contained $500 packets of money.

Search warrants have been executed on all known local bank accounts of the Defendant. Only approximately $1,000 has been discovered. Only approximately $300 was discovered in the Defendant's residence. The Defendant has been charged on a related incident (See County Court File #80448). Your complainant would ask the Court to take judicial notice of the contents of that complaint also.

On November 10, 1982, a second search warrant was executed to obtain keys from inside the Lamont residence. While there, officers discovered a woman by the name of Eldora Bergraff of Cloquet, Minnesota. Mrs. Bergraff reported that she was there at the residence for a ten o'clock appointment. She had heard about the arrest of Mrs. Lamont, but had come to her with a small gift. She was hoping to talk to Mrs. Lamont. She told officers that she had been seeing Mrs. Lamont regularly for at least once a week during the recent past. She could not recall exactly how much money she had given to Lamont, but estimated it

*COMPF^INT/INDICTMENT SUPPLEMENT*

**80511**

| CCT | SECTION/Subdivision | U.O.C. | GOC |
|---|---|---|---|
| | | | |

PAGE 12 of 18

SJIS COMPLAINT NUMBER(S):

69-11-3-005005

would approximately $40,000. She would check her bank records to be sure. She told the officers that her husband had no idea she spent the money and she did not want them to know. She advised she had come to talk to Mrs. Lamont about getting her money back. She expressed her desire to make a formal complaint to the police department.

In statement obtained from Mrs. Bergraff, she said that in March of 1982 she gave Mrs. Lamont $14,000. In May, she gave her $15,000 and in July, she gave her $6,500. She also said she gave her approximately $400 she had in cash around the house. She presented documentation consisting of bank records and cancelled money market certificates to verify the money that she had lost. According to her best estimate, she had received back approximately $8,500 from Mrs. Lamont but was still out the $36,600.

Mrs. Bergraff stated she first met Mrs. Lamont when her name was Eldora Walker. Her husband had died during the spring of 1981 and she had remarried Mr. Bergraff. Mrs. Bergraff stated she worked for the past two and a half years at a store nearby the Lamont residence. Mrs. Lamont was a frequent customer of the store. They began to get to know each other and would talk more and more frequently. Because of the interest that Mrs. Lamont appeared to show in Eldora, she began to trust her. After her first husband's death in May of 1981, her father also died in July of 1981.

During August of 1981, Mrs. Lamont suggested that Eldora should come to her home and talk with her. Mrs. Lamont said it would not cost anything, but that when they were done, she could leave a donation. A closer personal relationship developed and in December of 1981 or January of 1982, Mrs. Lamont told Eldora that she wanted to see how much the evil spirits had control of Eldora. She asked Eldora to take an egg home wrapped in a hankie and put it under her bed and bring it back the next visit. When she returned, the egg was broken open and inside the egg, Mrs. Lamont appeared to produce a wad of black hair in the yoke. Mrs. Lamont stated the black hair represented the evil spirits that were working on Eldora and she had to pray and burn candles for her.

On another occasion after this date, Eldora was advised to take a tomato, wrap it in a hankie and place it under her bed. She was advised to bring it to the next meeting at the Lamont residence. Mrs. Lamont told Eldora that if there was an animal in the tomato that they would have to really pray and burn candles because that would be big trouble.

Mrs. Lamont untied the hankie, covered the tomato, and then had Eldora smash it. When Mrs. Lamont opened the hankie and peeled back the tomato, she produced what appeared to be a small snake from inside. Mrs. Lamont then told Eldora there was alot of evil working against her and that they would do things the way God wants them to clear them up.

Later, Mrs. Lamont asked Eldora if she had any savings or checking accounts. Eldora told her she had access to approximately $43,000 which also included some type of inheritance. Mrs. Lamont told her to cash in any savings certificates and bring all of the money she could obtain to her to be wrapped in a white hankie and brought to her church to be blessed in order for the evil spirits to be destroyed. Mrs. Lamont told her the money was the cause of her depression and disappointment. Bank records indicate that during February of 1982, approximately $13,000 was withdrawn at Mrs. Lamont's direction and according to Eldora, was given to Mrs. Lamont. Mrs. Lamont said she would take the money to her church and pray on it because it was evil and that she would get the money as soon as the spirits told her it was okay. Eldora saw Mrs. Lamont frequently, approximately twice a week, and when she would repeatedly ask where her money was, she would always be told it was in the church being prayed for or blessed. During approximately May or June of 1982, after Mrs. Lamont had questioned her regarding her inheritance, Eldora told her she had received approximately $28,000. Mrs. Lamont wanted her to bring her the money so that it could be blessed so the devil would not live in it and the money would do good for her and not bad. Eldora brought her only half of the money and gave it to her. This money, like the other money, was in 50 and 100 dollar packets right from the bank. Mrs. Lamont said she would keep this money for the church to be blessed. On June 24, 1982, Mrs. Lamont told Eldora that God had told her to tell her to bring all the money to her to get it blessed or it would do her no good. Eldora brought Mary an additional

COMPLAINT/INDICTMENT SUPPLEMENT

80511

| CCT | SECTION/Subdivision | U.O.C. | GOC |
|---|---|---|---|
| | | | |



SJIS COMPLAINT NUMBER(S):

69-11-3-005005

$6,500 that she had gotten from the bank. This money was given to Mrs. Lamont and put with the rest of the money, according to her. Since that date, Eldora has received some of the money back, but is still out approximately $31,000.

The Duluth Police Department has also received report from one Bernice Thompson of Ely, Minnesota who has reported that she too has given money to Mrs. Lamont after being advised that money was evil and it was the cause of her problems. Mrs. Thompson stated that she was given $14,500 between May and November of 1982 to Mrs. Lamont at her residence. Mrs. Thompson stated that she first met Mrs. Lamont during May of 1982 and continued seeing her after that time. She too was directed to place an egg under her bed in a box and to bring it to Mrs. Lamont for the next visit. Mrs. Lamont told her this would be the test. When Mrs. Lamont unwrapped the handkerchief around the egg and smashed the egg, she produced from inside of it a small carved face about the size of a walnut shell with hair wrapped around it. At that time, Mrs. Lamont explained to Mrs. Thompson that there was evil within her family and that she had to make plans to rid her and her family of these problems. Note should be made that during the execution of the first search warrant at the Lamont residence, police officers seized what appeared to be a small rock, the size of a walnut shell, with two red eyes and a face, with a great deal of hair wrapped around it.

During a meeting in approximately May or June of 1982, Mrs. Lamont requested that Mrs. Thompson withdraw $20,000 out of her bank account and bring it to her so that the money could be cleansed. Mrs. Thompson said she only had $12,000 but would bring that to her. On June 1, 1982, Mrs. Thompson attempted to obtain the money in cash from her bank in Ely. However, she was given a cashier's check instead. When she brought the cashier's check in the amount of $12,500, Mrs. Lamont was very upset stating that it would not do and the check did not represent the "true meaning of money". She was instructed to return and obtain cash.

Similar to a previous incident which is the basis of another felony charge against the Defendant, Mrs. Thompson was required to bring a live chicken to the Lamont residence, spit into the chicken's mouth three times and if the chicken died, there would be continued trouble. This ritual was performed whereupon the chicken died as it was being held by Mrs. Lamont. Mrs. Lamont also represented to be burning the $12,500 brought to her by Mrs. Thompson. In later June of 1982, at Mrs. Lamont's direction, Mrs. Thompson brought her $2,000 in cash and also pieces of family jewelry. A ritual was performed over this money and it was turned over to Mrs. Lamont. Mrs. Thompson was repeatedly advised from the outset never to tell anyone about any of the goings on or a spell would be cast over her and none of the things that she would be praying for would come true if this information was revealed to anyone or family.

During a later meeting, Mrs. Thompson asked for the money and jewelry back saying she needed the money to live on. Mrs. Lamont told her that if she was desperate and needed money, that she would "loan her" enough money to get by on.

That one Thomas Haugen has also reported that he has lost money to the Defendant. Haugen contacted the Duluth Police Department on November 10, 1982, and reported that during a period from May through August of 1982, he had been seeing the Defendant and gave her approximately $8,315 in cash which was never returned. In order to induce Mr. Haugen to give her the money, the Defendant told him, among other things, that he had a "black cloud" surrounding him, and that his wife would commit suicide if he did not follow her suggestions and give her the money. Similar to the methods described above, the Defendant appeared to produce objects out of an egg and a tomato brought to her by Mr. Haugen. The Defendant also performed the "chicken ritual" requiring Mr. Haugen to bring her a live chicken and then to spit three times into the chicken's mouth as the chicken died. The Defendant also represented to burn money given to her by the Defendant telling him that it would be returned increased to him. On at least one occasion, Mr. Haugen asked the Defendant for the money, but she refused to give it back to him saying it may take as long as six months for her to "do her work with it".

The Duluth Police Department has also learned that one Arlan Holmes of Two Harbors, Minnesota, had visited the Defendant and had given her a great deal of money. The

COMPLAINT/INDICTMENT SUPPLEMENT

80511

| CCT | SECTION/Subdivision | U.O.C | GOC |
| --- | --- | --- | --- |
| | | | |

PAGE 14 of 18

SJIS COMPLAINT NUMBER(S):

69-11-3-005005

total amount of money that Mr. Holmes has given the Defendant is approximately $2600. Mr. Holmes has described that between a period from August of 1981 through November of 1981, he met with the Defendant and a person who repesented to be her 23-year-old daughter, Sylvia. He met at the Lamont residence at 316 W. Central Entrance on all of the occasions. One of the sessions involved Sylvia "producing" black and silver worms or snakes from the yolk of an egg which Holmes had brought to her. According to Sylvia, the black and silver worms were a sign of evil. In addition, Sylvia also produced an object which appeared to be a peach pit with hair and a face on it from another egg yolk in an egg brought by Holmes. As stated above, objects matching both of these items have been found in the Defendant's residence. According to Sylvia, the signs meant evil and that someone wanted to see him and his girlfriend break up and be hurt. When requested to do so, Holmes produced approximately $700 from his savings account and at the Defendant's insistence, even took out a $1,500 loan to give to the Defendant. Holmes also gave the Defendant additional money which amounted to the total of $2,600. At another meeting, after representing to put $2,000 of "church money" along with the $2,600 provided by Holmes, the Defendant then represented to Holmes to burn all of the money inside a pail. According to the Defendant, the money could suffer and draw the evil from his body.

Holmes has never received any of his money back from the Defendant and, on one occasion, the Defendant approached him demanding the $2,000 in church money because it was just a "loan to him".

Duluth Police officers have also received a report from Eleanore Bednarski of Silver Bay, Minnesota. Ms. Bednarski reports that during October through December, 1980, she had also been a "client" of the Defendant's. During this time period, Bednarski was talked into withdrawing a $10,000 savings certificate and giving the money to the Defendant in order to "rid it of evil spirits". When the money was given to the Defendant, the Defendant appeared to burn the money in her presence saying that the money would be returned to her after the evil spirits were done away with.

Prior to giving the whole $10,000 to the Defendant, Bednarski had witnessed the Defendant appear to burn a $20 bill in her presence, place the ashes in a handkerchief, order her to take the money home and place it under her bed and then the next, represented that the bill had been reinstated in its original form. The Defendant also performed the "serpent from the tomato" routine as outlined above in the previous cases. At all times, the Defendant emphasized to Bednarski to never tell anyone of the work that they were performing and that the money that she gave her was simply a "loan to a friend". Bednarski has received $5,000 of the money back but has not yet been given the remainder. All of the meetings between Bednarski and the Defendant took place at the Defendant's residence in the City of Duluth.

The person identified and referredto as Mrs. Lamont has since admitted to a number of aliases and that her real name is Laura Williams, maiden name, Laura Marks.

The above facts constitute his basis for believing that the above-named Defendant during 1982, at Duluth, in St. Louis County, committed the following described

COUNT I:

Charge: Theft by Swindle, in violation of

Section: 609.52 Subd. 2 (4)

Maximum Sentence: Ten years and/or $10,000

(description)

That Laura Williams, a/k/a Laura Marks; a/k/a Mrs. Lamont; a/k/a Mary Linda Lamont; a/k/a Ann Marlow; a/k/a Ann Davis; a/k/a Laura Miller; a/k/a Gifted Ann, the Defendant, did obtain property, to-wit; approximately $28,000 from one Frances Johnson, by swindle, by artifice, trick, device or other means.

COMPLAINT/INDICTMENT SUPPLEMENT

80511

| CCT | SECTION/Subdivision | U.O.C | GOC |
|---|---|---|---|
| | ADMINISTRATIVE INFORMATION | | |

PAGE 15 of 18

SJIS COMPLAINT NUMBER(S):

69-11-3-005005

COUNT II:

Charge: Theft by Swindle, in violation of

Section: 609.52 Subd. 2 (4)

Maximum Sentence: Five years and/or $5,000

(description)

That Laura Williams, a/k/a Laura Marks; a/k/a Mrs. Lamont; a/k/a Mary Linda Lamont; a/k/a Ann Marlow; a/k/a Ann Davis; a/k/a Laura Miller; a/k/a Gifted Ann, the Defendant, did obtain property, to-wit; approximately $1,300 from one Virginia Price, by swindle, by artifice, trick, device or other means.

COUNT III:

Charge: Theft by Swindle, in violation of

Section: 609.52 Subd. 2 (4)

Maximum Sentence: Ten years and/or $10,000

(description)

That Laura Williams, a/k/a Laura Marks; a/k/a Mrs. Lamont; a/k/a Mary Linda Lamont; a/k/a Ann Marlow; a/k/a Ann Davis; a/k/a Laura Miller; a/k/a Gifted Ann, the Defendant, did obtain property, to-wit; approximately $96,000 from one Helen O'Connell, by swindle, by artifice, trick, device or other means.

COUNT IV:

Charge: Theft by Swindle, in violation of

Section: 609.52 Subd. 2 (4)

Maximum Sentence: Ten years and/or $10,000

(description)

That Laura Williams, a/k/a Laura Marks; a/k/a Mrs. Lamont; a/k/a Mary Linda Lamont; a/k/a Ann Marlow; a/k/a Ann Davis; a/k/a Laura Miller; a/k/a Gifted Ann, the Defendant, did obtain property, to-wit; approximately $40,000 from one Eldora Bergraff, by swindle, by artifice, trick, device or other means.

FORM I-1

## COMPLAINT/INDICTMENT SUPPLEMENT

80511

| CCT | SECTION/Subdivision | U.O.C | GOC |
| --- | --- | --- | --- |
| | ADMINISTRATIVE INFORMATION | | |



SJIS COMPLAINT NUMBER(S): 69-11-3-005005

COUNT V:

Charge: Theft by Swindle, in violation of

Section: 609.52 Subd. 2 (4)

Maximum Sentence: Ten years and/or $10,000

(description)

That Laura Williams, a/k/a Laura Marks; a/k/a Mrs. Lamont; a/k/a Mary Linda Lamont; a/k/a Ann Marlow; a/k/a Ann Davis; a/k/a Laura Miller; a/k/a Gifted Ann, the Defendant, did obtain property, to-wit; approximately $14,500 from one Bernice Thompson, by swindle, by artifice, trick, device or other means.

COUNT VI:

Charge: Theft by Swindle, in violation of

Section: 609.52 Subd. 2 (4)

Maximum Sentence: Ten years and/or $10,000

(description)

That Laura Williams, a/k/a Laura Marks; a/k/a Mrs. Lamont; a/k/a Mary Linda Lamont; a/k/a Ann Marlow; a/k/a Ann Davis; a/k/a Laura Miller; a/k/a Gifted Ann, the Defendant, did obtain property, to-wit; approximately $8,315 from one Thomas Haugen, by swindle, by artifice, trick, device or other means.

COUNT VII:

Charge: Theft by Swindle, in violation of

Section: 609.52 Subd. 2 (4)

Maximum Sentence: Ten years and/or $10,000

(description)

That Laura Williams, a/k/a Laura Marks; a/k/a Mrs. Lamont; a/k/a Mary Linda Lamont; a/k/a Ann Marlow; a/k/a Ann Davis; a/k/a Laura Miller; a/k/a Gifted Ann, the Defendant, did obtain property, to-wit; approximately $2,600 from one Arlan Holmes, by swindle, by artifice, trick, device or other means.

# COMPLAINT SUPPLEMENT

80511

| CCT | SECTION/Subdivision | U.O.C. | GOC |
| --- | --- | --- | --- |
| | | | |

PAGE 17 of 18

SJIS COMPLAINT NUMBER(S):

69-11-3-005005

COUNT VIII:

Charge: Theft by Swindle, in violation of

Section: 609.52 Subd. 2 (4)

Maximum Sentence: Ten years and/or $10,000

(description)

That Laura Williams, a/k/a Laura Marks; a/k/a Mrs. Lamont; a/k/a Mary Linda Lamont; a/k/a Ann Marlow; a/k/a Ann Davis; a/k/a Laura Miller; a/k/a Gifted Ann, the Defendant, did obtain property, to-wit; approximately $10,000 from one Eleanore Bednarski, by swindle, by artifice, trick, device or other means.

*Said acts constituting the offense of:*

*in violation of Minnesota Statutes:*

*Maximum sentence:*

*THEREFORE, Complainant requests that said Defendant, subject to bail or conditions of release be:*
*(1) arrested or that other lawful steps be taken to obtain defendant's appearance in court; or*
*(2) detained, if already in custody, pending further proceedings,*
*and that said Defendant otherwise be dealt with according to law.*

COMPLAINANT'S NAME: OFFICER SCOTT LYONS

COMPLAINANT'S SIGNATURE: Scott R. Lyons

*Being duly authorized to prosecute the offense(s) charged, I hereby approve this Complaint.*

DATE: November 29, 1982

PROSECUTING ATTORNEY'S SIGNATURE: Mark S. Rubin

*PROSECUTING ATTORNEY:*

NAME: MARK S. RUBIN

TITLE: Assistant County Attorney

ADDRESS: 501 Court House, Duluth, MN 55802

TELEPHONE: 726-2323

FORM 1-3

15628

Court Case #: 80511 PAGE 18 of 18

## FINDING OF PROBABLE CAUSE

*From the above sworn facts, and any supporting affidavits or supplemental sworn testimony, I, the Issuing Officer, have determined that probable cause exists to support, subject to bail or conditions of release where applicable, Defendant (s) arrest or other lawful steps be taken to obtain Defendant (s) appearance in Court, or his detention, if already in custody, pending further proceedings. The Defendant (s) is/ are thereof charged with the above-stated offense.*

## SUMMONS

*THEREFORE You, THE ABOVE-NAMED DEFENDANT (S) ARE HEREBY SUMMONED to appear on the day of , 19 at AM/PM before the above-named court at to answer this complaint.*

*IF YOU FAIL TO APPEAR in response to this SUMMONS, a WARRANT FOR YOUR ARREST shall be issued.*

RECEIVED IN OFFICE AT ____ O'CLOCK ___M
NOV 30 1982
Clerk of District Court
JOSEPH M. LASKY
Deputy

X

## WARRANT

ZXZXEXECUTE IN MINNESOTA ONLYX

*To the sheriff of the above-named county; or other person authorized to execute this WARRANT; I hereby order, in the name of the State of Minnesota, that the above-named Defendant (s) be apprehended and arrested without delay and brought promptly before the above-named Court (if in session, and if not, before a Judge or Judicial Officer of such Court without unnecessary delay, and in any event not later than 36 hours after the arrest or as soon thereafter as such Judge or Judicial Officer is available) to be dealt with according to law.*

## ORDER OF DETENTION

*Since the above-named Defendant (s) is/are already in custody;*

*I hereby order, subject to bail or conditions of release, that the above-named Defendant (s) continue to be detained pending further proceedings.*

*Bail:*

*Conditions of Release:*

*This COMPLAINT — ~~SUMMONS~~ WARRANT, ~~ORDER OF DETENTION~~ was sworn to subscribed before, and issued by the undersigned authorized Issuing Judicial Officer this* 30 *day of* NOV *, 19*82

***JUDICIAL OFFICER:***

*Name:* *Signature:* Helen C. Wa[signature]

*Title:*

*Sworn testimony has been given before the Judicial Officer by the following witnesses:*

*STATE OF MINNESOTA* *COUNTY of* ST. LOUIS

# State of Minnesota

*Plaintiff,*

*vs.*

LAURA WILLIAMS a/k/a Laura Marks; a/k/a Mrs. Lamont; a/k/a Mary Linda Lamont; a/k/a Ann Marlow; a/k/a Ann Davis; a/k/a Laura Miller; a/k/a Gifted Ann, *Defendant (s)*

*Clerk's Signature or File Stamp:*

FILED
NOV 30 1982
County Court

*~~RETURN OF SERVICE~~*

*I hereby Certify and Return that I have served a copy of this COMPLAINT - ~~SUMMONS~~ WARRANT, ~~ORDER OF DETENTION~~ upon the Defendant (s) herein-named.*

*Signature of Authorized Service Agent:*

FORM J